Filed 10/8/21  In re Leigha W. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re LEIGHA W., a Person Coming Under the Juvenile Court Law. | B310184 (Los Angeles County  Super. Ct. No. 17CCJP02701) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,  Plaintiff and Respondent,  v.  C.W.,  Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Emma Castro, Judge Pro Tempore.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this dependency case (Welf. & Inst. Code, § 300 et seq.),[1] C.W. (Mother) appeals from the juvenile court's disposition order, challenging the sufficiency of the evidence supporting the removal of her infant daughter Leigha W. from her custody.  She also contends the juvenile court and the Los Angeles County Department of Children and Family Services (DCFS) failed to comply with duties under the Indian Child Welfare Act (ICWA). (25 U.S.C. § 1901 et seq.)  For the reasons explained below, we reject Mother's contentions and affirm the order.

## BACKGROUND

### I. Prior Dependency Proceedings Involving Mother and Leigha's Sibling and Half Sibling

As a minor, Mother was a dependent of the juvenile court. She was adopted by her paternal grandparents as a toddler, after the court terminated Mother's parents' rights.  At the time the current dependency proceedings commenced in January 2020, Mother lived with her adoptive mother/biological paternal grandmother, Vivian W.

In prior dependency proceedings, Mother lost custody of her two older children.  In May 2018, the juvenile court sustained a section 300 petition under subdivision (b), making the following jurisdictional findings:  (1) Mother's then-infant daughter A.W. tested positive at birth for marijuana and opiates, and Mother's

_____

[1] Further statutory references are to the Welfare and Institutions Code.

2

use of illicit drugs endangered the child's physical health and safety and placed the child at risk of serious physical harm and damage; (2) Mother abused marijuana and opiates, and A.W.'s father, L.W. (Father),[2] failed to protect A.W. and half sibling C.W. (Mother's two year old son from a prior relationship) from Mother's substance abuse, endangering the children's physical health and safety and creating a detrimental home environment that placed the children at risk of serious physical harm, damage, and failure to protect; (3) Father abused marijuana, which rendered him incapable of providing regular care for the children, and Mother failed to protect the children from Father's substance abuse, endangering the children's physical health and safety and creating a detrimental home environment that placed the children at risk of serious physical harm, damage, and failure to protect.

Later in May 2018, the juvenile court sustained a section 342 subsequent petition, making the jurisdictional finding under section 300, subdivision (b) that Mother was a then-current abuser of methamphetamine and marijuana, who on May 15, 2018, while A.W. and C.W. were in her care and under her supervision, was under the influence of and tested positive for methamphetamine, amphetamine, and marijuana, rendering her incapable of providing regular care for the children and endangering the children's physical health and safety and placing them at risk of serious physical harm and damage.

_____

[2] The child involved in the current dependency proceedings, Leigha W., is Mother and Father's child. Father is not a party to this appeal. Accordingly, we only summarize the relevant evidence and proceedings as they relate to Mother.

3

In January 2019, the juvenile court terminated Father's reunification services regarding A.W. In August 2019, the court terminated Mother's reunification services regarding A.W. and C.W. The court placed C.W. in the home of his biological father and placed A.W. with her maternal aunt (Mother's sister), Ebony. On or about December 1, 2019, the court denied Mother's section 388 petition regarding custody of her children. C.W.'s permanent placement was with his father, and A.W.'s permanent placement was under legal guardianship with Ebony.

## II. Current Dependency Proceedings

### A. Referral, section 300 petition, and non-detention of Leigha from Mother

The referral that led to the current dependency proceedings was made at the end of December 2019, less than a month after the juvenile court denied Mother's section 388 petition in the dependency proceedings involving her two older children. The caller (presumably a hospital employee) informed DCFS that Mother had just given birth to a baby girl (Leigha), and Mother disclosed she smoked marijuana during her pregnancy. Mother reported she had been clean since July 2019, the month she began her prenatal care, but Mother's prenatal records showed she tested positive for marijuana in August 2019, during her pregnancy.[3] Mother also missed three prenatal appointments. Upon her admission to the hospital Mother tested negative for drugs, so neither Mother nor Leigha was drug tested at the time of birth. The caller reported Leigha appeared healthy, was

---

[3] Mother also tested positive for marijuana in September 2019, during her pregnancy, but the caller did not report that in the referral.

breastfeeding, and had not shown symptoms of drug withdrawal. Mother was appropriate with Leigha, and the caller had no concerns. According to the caller, Father was "not involved" with Mother and Leigha.

On December 29, 2019, a DCFS social worker went to the hospital prior to Mother's and Leigha's discharge. A nurse told the social worker Leigha was doing well and bonding with Mother. Mother told the social worker she had not used marijuana since July 2019 (during her pregnancy), and the reason she tested positive in August 2019 was because there was still marijuana in her system from her use in July. Mother reported she tested negative for drugs in October 2019 (but did not mention her additional positive test for marijuana in September 2019, during her pregnancy). Mother stated she was enrolled in an outpatient drug treatment program through which she tested.

As stated in DCFS's February 3, 2020 Detention Report, when the social worker asked Mother about missing some prenatal appointments, Mother responded she had "a lot going on," but was not "trying to neglect the baby." Mother reported she received mental health services for depression at an agency where she had also received prenatal care, parenting support, and housing assistance. She explained she became homeless after losing custody of her two older children, but she was now living with Vivian (Leigha's maternal great-grandmother).

As set forth in the Detention Report: "Mother stated that she will remain in contact with DCFS at all times and that she just would like to have a chance to prove that she can provide[] for her child" (Leigha). Mother signed a safety plan, agreeing (1) to continue to attend the drug treatment program; (2) to remain

5

clean and sober; and (3) to attend all of Leigha's medical appointments.[4]

On January 8, 2020, the social worker visited Mother and Leigha at Vivian's home, in the presence of various maternal relatives who were supportive of Mother and stated Mother and Leigha were doing well. Mother said she attended a medical appointment for Leigha the day before. She reiterated she would continue to attend the drug treatment program and remain in contact with DCFS "at all times." She also stated she was "willing to [drug] test anytime." She said she had not heard from Father and planned to raise Leigha on her own.

On January 17, 2020, a social worker in the current case spoke with the social worker in the older sibling and half sibling's dependency case, CSW Bodden. Bodden explained Mother acted appropriately when she had contact with her older children, but Mother "did not do anything the court requested for her to reunify with the children." Bodden described Mother as uncooperative. Bodden reported dependency jurisdiction over A.W. was terminated in December 2019, with a legal guardianship with maternal aunt Ebony, but the case was going to be reopened to allow Ebony to access financial assistance and support services; and dependency jurisdiction over C.W. was scheduled to terminate in February 2020, with a permanent placement with the biological father. Bodden informed the social

_____

[4] One of the reasons DCFS was particularly concerned about Mother attending all of Leigha's medical appointments was because Leigha's older sister A.W. was hospitalized and diagnosed with failure to thrive at one month old, and Mother and Father were under the influence of marijuana when they brought A.W. to the hospital.

worker in the current case that Mother's drug treatment program only required her to test once a month.

A different social worker in the current case went to Vivian's home on January 17, 2020 to visit Mother and Leigha. Mother was not home, so the social worker left a business card with a maternal relative. The same day, Mother called the social worker. Using profanity, Mother asserted there was no cause for a DCFS investigation regarding Leigha and she did not want the social worker coming to her home. When the social worker requested documentation of her enrollment in a drug treatment program, Mother told the social worker to talk to CSW Bodden and access the information from the dependency case involving her two older children.

DCFS searched public records and discovered Father was listed as living at Vivian's home with Mother and Leigha (although Mother previously told DCFS she had not heard from Father and planned to raise Leigha on her own). DCFS learned from law enforcement that there were "chronic" family disputes at the home. Most recently, on December 16 and 17, 2019, law enforcement responded to the home regarding a dispute between Mother and one of her brothers.

DCFS sought a court order to remove Leigha from Mother's and Father's custody. On January 28, 2020, the judicial officer who presided over the dependency case of A.W. and C.W., signed an order authorizing DCFS to remove Leigha from Father, but not from Mother. On January 29, 2020, DCFS social workers and a police officer went to the family home to serve the removal order on Father and to provide Mother with notice of the detention hearing in this case. The social workers reported in the

Detention Report that they noticed a strong odor of marijuana coming from the home as they approached.

Father was cooperative; Mother was not. Father agreed to leave the family home. Mother came outside and cursed at the social worker with whom she had had prior contact in this case and ordered her to leave the property. Mother refused requests from the social worker and the police officer to check on Leigha. Father retrieved Leigha from inside the home and told Mother to calm down and allow the social workers and police officer to do their jobs. Mother took Leigha from Father and moved toward the door to the house. Father stood by the door and asked Mother to let them see the child. Mother hesitantly allowed the social worker to take a photo of Leigha and then walked toward the door. Using profanity, Mother ordered the social worker to leave the porch.

In the Detention Report, DCFS recommended the juvenile court detain Leigha from Mother due to Mother's unresolved substance abuse issues. DCFS noted Mother did not begin participating in the drug treatment program until after her reunification services were terminated in the dependency case involving A.W. and C.W., which commenced due to Mother's substance abuse. DCFS attached to the Detention Report progress reports from the drug treatment program, dated November 5 and December 6, 2019, stating, in pertinent part: (1) Mother enrolled in the program on July 23, 2019; (2) she was required to take one random drug and alcohol test per month; (3) she tested positive for marijuana on August 1 and September 30, 2019; (4) she tested negative for all substances on October 14, 2019 and November 25, 2019; (5) she successfully completed all program requirements on November 26, 2019, including 10

8

individual counseling sessions, 13 relapse prevention group sessions, and eight parenting group sessions; (6) she was moving into the recovery support services phase of the program in which she would attend six hours of parenting group sessions and one hour of individual counseling per month; and (7) she was expected to graduate from this phase of the program at the end of January 2020. There was no further progress report attached to the February 3, 2020 Detention Report.

On January 31, 2020, DCFS filed the current dependency proceeding under section 300, subdivisions (b) and (j), alleging:

"[Mother] has a history of substance abuse including marijuana, opiates, and methamphetamine and is a current abuser of marijuana, which renders the mother incapable of providing regular care and supervision of the child [Leigha]. The mother abused marijuana during the mother's pregnancy with the child. On 08/01/2019 and 09/30/2019, the mother had positive toxicology screens for marijuana. The child is of such young age requiring constant care and supervision and the mother's substance abuse interferes with providing regular care and supervision of the child. The child's siblings C[.]W[.] . . . and A[.]W[.] . . . are current dependents of the Juvenile Court and the sibling A[.W.] is receiving Permanent Placement services due to the mother's substance abuse and [Father's] failure to protect the child's sibling A[.W.] [Father] knew of the mother's substance abuse and failed to take action to protect the child. The mother's substance abuse and the father's failure to take action to protect the child endangers the child's physical health and safety, and places the child at risk of serious physical harm, damage, danger, and failure to protect." (Counts b-1 & j-1.)

"[Father] has a history of substance abuse including marijuana, which renders the father incapable of providing regular [care] and supervision of the child [Leigha]. The child is of such young age requiring constant care and supervision and the father's substance abuse interferes with providing regular care and supervision of the child. The child's sibling A[.W.] . . . is a current dependent of the Juvenile Court and is receiving Permanent Placement services due to the father's substance abuse and [Mother's] failure to protect. [Mother] knew of the father's substance abuse and failed to protect the child by allowing the father unlimited access to the child. The father's substance abuse and the mother's failure to protect the child endangers the child's physical health and safety, and places the child at risk of serious physical harm, damage, danger, and failure to protect." (Counts b-2 & j-2.)

Mother and Father appeared at the detention hearing on February 3, 2020. The juvenile court found DCFS made a prima facie showing that Leigha was a person described by section 300. The court ordered Leigha detained from Father. Over DCFS's objection, the court ordered Leigha to remain released to Mother. Mother's counsel supported Leigha's release to Mother if the court imposed a safety plan. The court imposed the following conditions on the release: (1) Mother must submit to weekly drug testing; (2) Mother must make Leigha available for unannounced home visits by DCFS; (3) Father may not live in the family home; and (4) DCFS must provide Mother with family preservation referrals and Mother must comply with family preservation services.

On February 13, 2020, DCFS referred Mother for weekly drug testing and informed her that a missed test would be considered a positive test.

A dependency investigator met with Mother on February 25, 2020. Mother presented well and welcomed the investigator into the family home. The investigator provided Mother with a list of referrals for family preservation services, and Mother signed a letter confirming receipt of the referrals. Mother denied current drug use but stated she did not believe her or Father's drug use interfered with their ability to parent. She stated she was still enrolled in the drug treatment program, was participating in parenting classes, and attended therapy once a month for her depression. The investigator observed Leigha, who appeared to be doing well. Leigha missed a medical appointment on February 20, 2020 because Mother brought Leigha to the appointment more than an hour late and then refused to wait for Leigha to be seen. But Mother took Leigha to an appointment on March 5, 2020, and Leigha was deemed healthy. On March 6, 2020, a new social worker met with Mother to again complete a safety plan to address DCFS's concerns and to ensure Mother was abiding by the juvenile court's conditions for Leigha's release to Mother.

Mother failed to show for drug tests on February 20 and 26 and March 6 and 26, 2020. Mother blamed the missed tests on her bad memory. Mother tested negative for drugs on March 5, 13, 18, and 27 and April 1, 2020.

At the end of March 2020, although DCFS deemed Mother's compliance with family preservation services to be "inconsistent," DCFS recommended Leigha remain in Mother's home and participate in family maintenance services, including weekly

drug testing, substance abuse counseling, parenting classes, a mental health assessment, and individual therapy. DCFS also deemed Mother's compliance with Leigha's routine health care to be inconsistent and in need of improvement.

On April 8, 2020, Mother's family preservation services caseworker informed the social worker that she had only had one session with Mother due to the COVID-19 pandemic. During the virtual session, Mother "was actively engaged, receptive to information, and open to services."

## B. Leigha's detention from Mother and DCFS's ex parte application under section 385

On May 31, 2020, DCFS sought a court order to remove Leigha from Mother's custody. In the application, DCFS explained on May 15, 2020, it received a referral alleging Mother, Leigha, and Leigha's sibling A.W. and half sibling C.W. were "involved in a gang related shooting at the [family] home." The reporting party stated the police searched the family home and were "looking to arrest [M]other," who had left the home with two of her brothers who were associated with a gang.

The day DCFS received the referral, May 15, 2020, the social worker called Mother to assess her and Leigha's safety. Mother did not answer, so the social worker left a voice mail message for Mother.

Also on May 15, 2020, the social worker called Mother's sister Ebony, who stated she was at the family home with the children (Leigha, A.W. and C.W.) in early May 2020, when she

12

heard gunshots outside the home.[5]  According to Ebony, after the gunshots, Mother and some of their brothers ran into the home. Soon thereafter, Mother and one their brothers left the home. The children were taken to McDonald's to meet another aunt, Am.W. (another of Mother's sisters).[6]

The social worker contacted Am.W., who stated Leigha (now four and a half months old) was with family friend, Z.S.  On May 15, 2020, the same day as the referral, the social worker visited Leigha at Z.S.'s home, with Ebony and Am.W. present. The social worker noted no safety concerns at that time and left Leigha with Z.S.  Z.S. agreed to inform the social worker if Mother arrived to pick up Leigha.

The social worker got in touch with Mother by phone on May 15, 2020 and asked her for an in-person meeting with her and Leigha to discuss the shooting and to assess Leigha's safety and well-being.  Mother refused to meet in person or provide the address where she was staying.  Mother confirmed there was a shooting near the family home but denied she or her family was involved.  When the social worker asked who was present at the time of the shooting, Mother refused to answer.  Mother told the social worker Leigha was staying with Ebony.  The social worker expressed concern that Mother did not know the whereabouts of her infant daughter, who had been passed around to family

---

[5] Apparently, Mother had arranged for Ebony to care for Leigha while Mother and Vivian (Leigha's maternal great-grandmother) recovered from COVID-19.

[6] It is not clear from the way DCFS's reports are written whether it was Mother or Ebony who brought the children to Am.W.

members and a family friend. Mother responded that they could do whatever they wanted with her child because she trusted them with Leigha.

In a subsequent text message, Mother informed the social worker that the police searched the family home after the shooting because her brothers had "mandatory" search conditions (apparently because they were on parole), and not because anyone in the family was involved in the shooting. In a follow-up telephone call regarding the shooting on May 18, 2020, Mother cursed at the social worker and stated she wanted a different social worker to handle the investigation.

On May 26, 2020, the social worker learned Mother had been arrested for carrying a loaded firearm in public. On May 29, 2020, Mother was released from jail on her own recognizance. The next hearing in her criminal case was scheduled for June 18, 2020.

On May 31, 2020, the juvenile court issued an order authorizing DCFS to remove Leigha from Mother's custody. On June 1, 2020, DCFS placed Leigha in foster care due to family friend Z.S.'s "DCFS history for physical abuse," requiring DCFS to conduct further investigation before formally placing Leigha with Z.S.

On June 4, 2020, DCFS filed an ex parte application under section 385 for an order terminating the home of parent order and requesting the juvenile court issue a new order for suitable placement of Leigha, based on the information set forth above regarding the shooting and Mother's arrest. At a June 8, 2020 detention hearing on the ex parte application, at which Mother appeared, DCFS and Leigha's counsel asked the juvenile court to detain Leigha from Mother based on Mother's failure to abide by

14

the court's conditions for releasing Leigha to Mother, namely Mother's refusal to make Leigha available to DCFS and participate in family preservation services.  The court detained Leigha from Mother, ordered monitored visitation for Mother, and ordered DCFS to assess family friend Z.S. for possible placement.

## C.    Jurisdiction/disposition

### 1.    DCFS's reports

In an Interim Review Report for the October 20, 2020 adjudication/disposition hearing, DCFS stated that it had placed Leigha with Ebony (Mother's sister), and Leigha was doing well in her care.  Ebony reported that visits between Mother and Leigha were going well.

The dependency investigator attempted to contact Mother to interview her for the report, but neither of the telephone numbers Mother had provided DCFS was in service.  Based on Mother's most recent contact with the social worker, Mother was refusing to re-enroll in drug treatment because she believed she had already completed what she was asked to do and Leigha was detained from her " 'for no reason.' "  Mother also was refusing to drug test or participate in a Child and Family Team (CFT) meeting.  Mother failed to show for drug tests on 10 occasions between June 10 and September 22, 2020.

DCFS recommended the juvenile court sustain the allegations in the dependency petition, remove Leigha from Mother and Father, and order reunification services for Mother (but not Father, whose whereabouts were unknown to DCFS).

### 2.    Hearings

At the adjudication hearing, which began October 20, 2020 and at which Mother appeared, the juvenile court admitted into

15

evidence DCFS's reports (which include the information summarized above). The court did *not* admit into evidence an exhibit from Mother—which she represented were criminal court minute orders from her case, stating the criminal court placed her on informal diversion and dismissed her case in the interests of justice—because the minute orders did not have her name (or any defendant's name) on them. DCFS represented to the court it had verified that Mother's criminal case had been dismissed, and the juvenile court accepted DCFS's statement.

DCFS urged the juvenile court to sustain the allegations in the section 300 petition and remove Leigha from Mother and Father, arguing Mother's and Father's substance abuse placed Leigha at risk of harm. DCFS's counsel noted Mother had a "significant history of substance abuse," as revealed in the dependency case involving her two older children, and now Mother was refusing to test or participate in services or attend a CFT meeting. Counsel further stated DCFS was concerned about law enforcement's response to family disturbance calls at the home, the May 2020 shooting near the home, and Mother's arrest for carrying a loaded firearm in public (notwithstanding the dismissal of the criminal case). Counsel also stated that when DCFS filed the ex parte application to remove Leigha from Mother's custody, DCFS was not only concerned about the shooting, "it was that Mother was passing the child around to various family members, wouldn't tell the worker where she was staying, [and] refused to meet with the social worker."

Leigha's counsel joined in DCFS's recommendations, arguing, with Mother's history of drug use, counsel could not advocate for placing Leigha with Mother in the absence of any

16

recent drug test results.[7]  Leigha's counsel suggested the court consider ordering unmonitored visitation for Mother if she tested clean on a certain number of consecutive tests.

Mother's counsel urged the juvenile court to dismiss the petition and return Leigha to Mother's custody, arguing DCFS had "not alleged any facts that support a finding that the mother has current substance abuse issues."  Mother's counsel added: "On paper, the only real reason the child was removed [from Mother] was due to the mother's arrest, which did get resolved, and the mother did get her charge dismissed."  Counsel suggested if the court did not immediately release Leigha to Mother, the court should grant DCFS discretion to release to Mother after three consecutive clean drug tests.

The juvenile court took judicial notice of its February 3, 2020 minute order from the detention hearing, stating for the record that the court conditioned Leigha's release to Mother at that hearing on the condition that Mother drug test weekly.  The court noted it released Leigha to Mother at that time over DCFS's objection.  Mother failed to abide by that condition of Leigha's release to her.  The court continued the adjudication/disposition hearing to November 17, 2020 to allow Mother to submit to a few weekly drug tests.  The court admonished Mother that the court would consider a missed drug test to be a positive test.

Mother did not submit to any drug tests between October 20 and November 17, 2020.

---

[7] According to DCFS's records, Mother last tested on April 1, 2020, more than six months before the hearing.  That test was negative for drugs.

17

At the November 17, 2020 continued adjudication/disposition hearing, at which Mother appeared, the juvenile court took judicial notice of the sustained dependency petitions, case plans, and minute orders in the dependency case involving Mother's two older children (A.W. and C.W.), as well as the section 364 report concerning C.W.  The court noted both A.W. and C.W. were in permanent plans, not in Mother's custody.

The juvenile court dismissed the counts alleged in the section 300 petition under subdivision (b), and sustained the identical allegations pleaded in the petition under subdivision (j), as quoted above.  In explaining why it found by a preponderance of the evidence there was a substantial risk of harm to Leigha based on the allegations, the court reviewed on the record the history of the siblings' case and this case.  The court noted Mother had not completed the programs she was asked to do; nor did Mother submit to weekly drug tests after the court continued the adjudication/disposition hearing to give her an opportunity to do so; and Mother failed to communicate with DCFS.  For these reasons, the court decided to remove Leigha from Mother's custody.

The juvenile court declared Leigha a dependent of the court and removed her from Mother and Father, stating clear and convincing evidence supported the removal order in that "there is substantial danger if the child [is] returned home to the child's physical heath, safety, protection and physical wellbeing, and there are no reasonable means by which to protect without removing custody from the mother and father."  The court granted reunification services for Mother and denied them for Father (who was not present and was not participating in the case).  The court ordered Mother to complete a case plan,

including parenting, individual counseling, and a drug treatment program with random and on demand every other week testing. The court also ordered monitored visitation for Mother, granting DCFS discretion to liberalize Mother's visits to unmonitored and overnight visits, "consistent with Mother's progress in her case plan."

## DISCUSSION

Mother challenges the sufficiency of the evidence supporting the juvenile court's removal of Leigha from her custody. She also contends the juvenile court and DCFS failed to comply with duties under ICWA. The facts related to the ICWA inquiry are set forth below.

## I.     Removal of Leigha from Mother's Custody

A juvenile court may take a dependent child from the physical custody of her parent where "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's . . . physical custody." (§ 361, subd. (c)(1).)

"A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.] The court may consider a parent's past conduct as well as present circumstances. [Citation.] [¶] Before the court issues a removal order, it must find the child's welfare

19

requires removal because of a substantial danger, or risk of danger, to the child's physical health if he or she is returned home, and there are no reasonable alternatives to protect the child. [Citations.] There must be clear and convincing evidence that removal is the only way to protect the child." (*In re N.M.* (2011) 197 Cal.App.4th 159, 169-170.)

"Whether the conditions in the home present a risk of harm to the child is a factual issue" to which "we apply the substantial evidence test." (*In re N.M.*, *supra*, 197 Cal.App.4th at p. 170.) "[A]ppellate review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands. In a matter such as the one before us, when reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996.)

We note Mother does not challenge the juvenile court's jurisdictional finding that her history of substance abuse and current abuse of marijuana placed Leigha at risk of serious physical harm, damage, danger, and failure to protect. Nor does Mother challenge any aspect of the case plan the court imposed.

20

The record before us contains substantial evidence from which the juvenile court could have found it highly probable that Leigha's welfare required removal from Mother because of Mother's history of substance abuse. The court expressed serious concern about Mother's refusal to participate in services, including drug testing, in light of her history of substance abuse, which had resulted in her recent loss of custody of two other children.[8] Leigha was an infant, who required constant care and supervision, when DCFS removed her from Mother's custody.

Mother agues the juvenile court and DCFS failed to explore reasonable means to protect Leigha other than removal. In her reply brief on appeal, Mother asserts: "Drug testing and treatment[] could have been ordered by the juvenile court as a reasonable means to prevent removal. [Citation.] [DCFS] failed to demonstrate that if [M]other was ordered to drug test and participate in substance abuse treatment as a condition of having custody of her daughter, [M]other would not comply or that the child would still be at risk." The court continued the adjudication/disposition hearing to allow Mother an opportunity to submit to a few drug tests, but Mother refused to test. Mother had not tested for seven and a half months before the continued hearing. As Leigha's counsel stated at the first session of the

_____

[8] Mother asserts we must reverse the disposition order because the juvenile court did not state its reasons for removing Leigha from Mother's custody, as required under section 361, subdivision (e). We disagree. The court clearly indicated it was removing Leigha from Mother's custody because Mother's refusal to participate in services, including drug testing, was seriously concerning to the court in light of Mother's history of substance abuse.

21

adjudication/disposition hearing, Leigha's safety with Mother could not be assessed in the absence of drug test results, given Mother's history of substance abuse.

Mother also refused to communicate with DCFS so that DCFS could assess Leigha's safety in Mother's custody. Before DCFS lost touch with Mother, Mother refused to schedule an in-person meeting with DCFS after the shooting and refused to provide DCFS with her address. She also refused to make Leigha available to DCFS and refused to participate in a CFT meeting. Then DCFS lost touch with Mother altogether when Mother's phone numbers stopped working, and Mother failed to provide DCFS with a new phone number.

The juvenile court and DCFS could not explore reasonable means to protect Leigha without removing her from Mother's custody if Mother refused to participate in services, refused to drug test, and refused to have any communication with DCFS. Substantial evidence supports the juvenile court's decision to remove Leigha from Mother's custody.

## II.   ICWA Inquiry

### A.    Proceedings below

As set forth in the Detention Report in this case, in the prior dependency proceeding involving Mother and Leigha's sibling and half sibling, the juvenile court found ICWA did not apply.

When the social worker visited Mother in the hospital at the end of December 2019, after Leigha's birth, Mother reported her family had Cherokee, Blackfoot and Chippewa Native American ancestry.

On an attachment (form ICWA-010(A)) to the dependency petition in this case, filed on January 31, 2020, DCFS checked a

22

box indicating the "child may have Indian ancestry," based on Mother's recent report. DCFS also noted a minute order from the dependency case involving Leigha's sibling and half sibling stated ICWA did not apply.

On February 3, 2020, the day of the detention hearing, Mother filled out and signed form ICWA-020, "Parental Notification of Indian Status." She checked the box stating, "One or more of my parents, grandparents, or other lineal ancestors is or was a member of a federally recognized tribe," listed the tribe as Cherokee, and wrote maternal great-aunt, Diane W. Father also filled out form ICWA-020, indicating he did not believe he had any Indian ancestry.

At the February 3, 2020 detention hearing, the juvenile court stated Mother "believes there is Cherokee on her side of the family through the maternal great aunt," so the court ordered DCFS to send ICWA notices to the Cherokee Nation, Bureau of Indian Affairs (BIA), and the Secretary of the Interior. The court's minute order from the detention hearing states DCFS was ordered to investigate Mother's claim of Indian ancestry. The court found it had no reason to know ICWA applies to Father.

On February 26, 2020, DCFS mailed ICWA notices (form ICWA-030) to all appropriate Cherokee, Blackfoot, and Chippewa tribes, and the BIA. On the form notice, DCFS listed Mother's and Father's names, addresses, and dates of birth; the names of Mother's parents and paternal grandparents; the address for Mother's paternal grandmother, Vivian (with whom Mother lived); and the possible tribal affiliation for all persons listed. In a Last Minute Information for the Court, dated March 27, 2020, DCFS reported it had received return receipts from the tribes and the BIA and attached them to the report. In addition, eight

23

tribes sent letters to DCFS indicating Leigha is not an Indian child.

On October 19, 2020, DCFS received a letter from the Cherokee Nation, indicating Vivian is an enrolled member of the tribe, and listing Vivian's enrollment number. The letter also states, in pertinent part: "At this time, the child is NOT an 'Indian child' in relation to the Cherokee Nation as defined in [ICWA]. Therefore, the Cherokee Nation does not have legal standing to intervene or participate in this matter until the child/children or eligible parent/s receive membership. Any incorrect or omitted information could invalidate this determination." The Cherokee Nation enclosed with the letter "a courtesy membership application" for Leigha, with information pre-filled, including names and dates of birth for Leigha, Mother, Mother's father, and Vivian. The application also lists Vivian's roll number. In the space for the roll numbers of Mother and her father, the application states, "application pending." As set forth in the Last Minute Information for the Court, the social worker attempted to contact Mother by telephone regarding the letter and application from the Cherokee Nation, but the telephone numbers Mother had provided to DCFS were not in service.

At the adjudication/disposition hearing on October 20, 2020, Mother's counsel informed the juvenile court that Mother "did not know of any pending Cherokee Tribe application," Mother "will not be bringing up any ICWA issues," and Mother wanted to proceed with the adjudication/disposition on October 20. The court stated the ICWA inquiry was "still ongoing" and asked DCFS to provide an update for the continued November 17,

24

2020 adjudication/disposition hearing, so the court could make an ICWA finding.[9]

At the November 17, 2020 continued adjudication/disposition hearing, the juvenile court made a finding that ICWA does not apply based on the letter from the Cherokee Nation. The court encouraged Mother to proceed with an application for membership.

### B. Analysis

Under ICWA, an "Indian child" is an unmarried person under 18 years of age who is (1) a member of a federally recognized Indian tribe or (2) is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe. (25 U.S.C. § 1903(4) & (8); see § 224.1, subd. (a) [adopting federal definitions].)

DCFS and the juvenile court "have an affirmative and continuing duty to inquire whether a child" involved in dependency proceedings "is or may be an Indian child." (§ 224.2, subd. (a).) When DCFS detains a child and places that child in foster care, its duty to inquire "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) "At the first appearance in court of each party, the court shall ask

---

[9] As set forth above, the juvenile court continued the adjudication/disposition hearing from October 20 to November 17, 2020 to provide Mother an opportunity to submit to a few drug tests.

each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child" (§ 224.2, subd. (c)) and order the parents to complete form ICWA-020 (Parental Notification of Indian Status).  (Cal. Rules of Court, rule 5.481(a)(2)(C).)  If the juvenile court or social worker "has reason to believe that an Indian child is involved in a proceeding," the court or social worker "shall make further inquiry regarding the possible Indian status of the child," including, but not limited to:  (1) interviewing the parents and extended family members; (2) contacting the Bureau of Indian Affairs and the State Department of Social Services for assistance in identifying and contacting tribes; and (3) contacting tribes and others "that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility."  (§ 224.2, subd. (e).)

ICWA notice is required if DCFS or the juvenile court knows or has reason to know a child is an Indian child.  (25 U.S.C. § 1912(a); § 224, subd. (a); Cal. Rules of Court, rule 5.481(b)(1).)

We review the juvenile court's ICWA findings under the substantial evidence standard.  (*In re Austin J.* (2020) 47 Cal.App.5th 870, 885.)  "A notice violation under ICWA is subject to harmless error analysis.  [Citation.]  'An appellant seeking reversal for lack of proper ICWA notice must show a reasonable probability that he or she would have obtained a more favorable result in the absence of the error.' "  (*In re Autumn K.* (2013) 221 Cal.App.4th 674, 715.)

Mother contends DCFS failed to make "further inquiry" regarding Leigha's possible Indian status, specifically interviewing family members and having informal contact with

26

the Cherokee Nation, prior to sending ICWA notice to the Cherokee Nation. She further contends the juvenile court's finding that ICWA did not apply was premature until DCFS made such further inquiry. She also asserts the error was not harmless because further inquiry by DCFS would have resulted in complete information about Vivian being listed on the ICWA notice to the Cherokee Nation, and could have revealed the identities of other family members who were enrolled in the tribe.

To the extent DCFS and the juvenile court failed to fulfill the duty of inquiry, any error was clearly harmless. The Cherokee Nation was able to locate Vivian's tribal enrollment information even though the notice DCFS sent omitted Vivian's date of birth and failed to indicate whether she was alive or deceased.

The juvenile court did not err in finding ICWA did not apply. The Cherokee Nation explained the fact Vivian was an enrolled member did not mean Leigha was an Indian child. Mother was apprised of the steps she needed to take to pursue possible tribal membership for herself and Leigha, and Mother expressed no inclination to pursue the matter further. The court's ICWA finding was not premature, as the Cherokee Nation determined Leigha was not an Indian child and Mother declined to take any further action that might alter that determination.

**DISPOSITION**

The disposition order is affirmed.

NOT TO BE PUBLISHED

                                        CHANEY, J.

We concur:


        BENDIX, Acting P. J.



        CRANDALL, J.*

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.